IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

SHARON MARIE GENTRY                )
                                    )
v.                                  )       No. 2:12-0015
                                    )       Judge Nixon/Bryant
SOCIAL SECURITY ADMINISTRATION      )

To:     The Honorable John T. Nixon, Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to

obtain judicial review of the final decision of the Social Security Administration ("SSA" or

"the Administration") denying plaintiff's applications for disability insurance benefits and

supplemental security income, as provided under the Social Security Act.  The case is

currently pending on plaintiff's motion for judgment on the administrative record (Docket

Entry No. 9), to which defendant has responded (Docket Entry No. 13).   Upon consideration

of these papers and the transcript of the administrative record (Docket Entry No. 5),[1] and for

the reasons given below, the undersigned recommends that plaintiff's motion for judgment

be DENIED and that the decision of the SSA be AFFIRMED.

## I.  Introduction

Plaintiff has accurately stated the case in her brief, as follows:

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

On May 15, 2007, Ms. Gentry protectively filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income. (Tr. 195-207). In both applications, she alleged disability beginning October 12, 2006. These claims were denied initially on September 24, 2007 (Tr. 110) and upon reconsideration on January 18, 2008. (Tr. 117) Thereafter, she filed a written request for hearing on February 5, 2008 (Tr. 121). On August 13, 2009, a video hearing was held and Ms. Gentry appeared in Cookeville, Tennessee. Edward M. Smith, an impartial vocational expert, also appeared at the hearing. Ms. Gentry was represented by William E. Halfacre III, an attorney, at the time of this hearing. The ALJ issued a decision dated October 14, 2009. (Tr. 92-103). A Request for Review of Hearing Decision was filed. The Appeals Council entered an order remanding the case to the Administrative Law Judge on November 16, 2010. (Tr. 104-107). Ms. Gentry filed a subsequent claim for Title II and Title XVI benefits. The ALJ held that the Appeals Council's action rendered the subsequent claim duplicate and associated the two claims files. (Tr. 13).

A second hearing was held on July 19, 2011. (Tr. 29-54). On September 23, 2011, the ALJ issued a second decision finding the Plaintiff not disabled. (Tr. 9-28). (Docket Entry No. 10 at 1)

The second ALJ decision contains the following enumerated findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.    The claimant has not engaged in substantial gainful activity since October 12, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following impairments, the combination of which is severe: status post cervical fusion; cervical degenerative disc disease; arthritis

with shoulder pain; mild carpal tunnel syndrome; mild diverticulosis; lupus; gastroesophageal reflux disease; breast cyst; and major depressive disorder (20 CFR 404.1520(c) and 416.920 (c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1568(c) and 416.967(c) except the claimant can do no constant rotation of the neck.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on May 29, 1958 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 12, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15-16, 21-22)

On January 31, 2012, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-3), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II.  Review of the Record

Again, plaintiff sets forth a comprehensive review of the voluminous record in this case (Docket Entry No. 10 at 2-22), the large majority of which is set forth verbatim below:

[Following an extended course of conservative therapy to address a cervical spine injury and related chronic symptoms resulting from her history of two motor vehicle accidents and a workplace injury,] [b]ecause Ms. Gentry failed to improve with conservative treatment,

> she underwent surgery by Dr. Rodriguez-Cruz on October 12, 2006 consisting of anterior cervical discectomy and fusion at C5-6. The pre-operative and post-operative diagnosis was herniated disc with spondylosis, C5-C6, with right arm radiculopathy. (Tr. 510-511, 535-537, 707-708). Intraoperative x-rays were obtained revealing hardware pointing to the C6-C7 disc space and anterior fusion hardware at the C5-C6 level. (Tr. 496, 528-529, 538-541).
>
> On November 10, 2006, she went to Dr. Cruz complaining bitterly of neck pain and headaches. Her arm was improved. She has brachialis weakness on the right side that remained. Physical therapy specifically targeted for the right arm strengthening and increased cervical range of motion. (Tr. 484). AP and lateral views of the cervical spine revealed a bony fusion at C5-6, with maintained alignment and mild degenerative disc space narrowing at C6-C7.

4

(Tr. 494, 542-543).

On December 6, 2006, Ms. Gentry went to Dr. Roberts with complaints of bilateral foot pain and bilateral index DIP pain. She was diagnosed with a Morton's neuroma of the 3rd and 4th interspace of both feet. She had been through three injections and had failed to respond to this. She had tried toe wide shoes and orthotics but none of this had given her any lasting relief. Examination of both feet showed she had point tenderness over the 3rd and 4th interspace of both feet. She had a positive molder click more on her right not really any on the left. She had no sensory alterations of either foot. (Tr. 471).

On December 11, 2006, Dr. Cruz noted that her strength was normal and her cervical range of motion was limited secondary to stiffness. Her neck pain and stiffness actually improved with activity. (Tr. 483). X-ray of the cervical spine showed unchanged appearance of the C5-6 ACF. (Tr. 493, 546).

On January 2, 2007, she returned to Dr. Leonardo R. Rodriguez-Cruz. She was doing extremely well in regards to her arm pain and numbness but she still had stiffness in her neck from the cervical fusion. On exam, her trace brachialis was gone and she had good pulses. It was noted that if she had a job to go back to she could go back without restrictions. Dr. Rodriguez-Cruz noted that her worker's compensation case was closed at this time and she would be ready to go back to any type of work without any restrictions and her disability rating according to DRT category #4 was *25%* impairment of the whole person, as she had a successful surgical arthrodesis and no cervical radiculopathy present. (Tr. 482, 663, 709).

On January 5, 2007, x-rays of the cervical spine revealed anterior cervical fusion. The C4-5 and C6-7 levels were unchanged. There was a small amorphic type density projected over the skull possibly due to calcified choroid plexus. (Tr. 492, 552, 664).

Records from Dr. Jain dated January 22, 2007 reflect symptoms of joint pain along with stiffness and pain in the legs, hands and arm for the past year. Joint pain was getting worse, was constant, and was severe. Ms. Gentry reported the joint pain was keeping her awake at night. She also had increasing joint stiffness which was described as severe. (Tr. 584, 587, 644-646).

On January 25, 2007, she returned to Dr. Roberts with one area on the dorsum of her foot that had not healed. Toe exercises were recommended. She was allowed to start wearing a comfortable wide shoe. (Tr. 469). On February 22, 2007, she saw Dr. Roberts in follow-up after having undergone a left Morton's neuroma excision. She was now asymptomatic but her right foot was

bothering her. On examination she had tenderness over the 3rd and 4th interspace of the right foot. She was assessed with status post Morton's neuroma of the left foot and Morton's neuroma of the right foot. The right 3rd and 4th interspaces were injected with 80mg of DepoMedrol and she was advised that she might need surgical treatment on her right as well. (Tr. 467).

In April 2007 four views of the cervical spine showed normal alignment with no fracture or dislocation and there was anterior fusion hardware, which appeared intact and the prevertebral soft tissues appeared normal. (Tr. 491, 554, 710).

She returned to see Dr. Leonardo Rodriguez-Cruz on April 30, 2007, with complaints of constant neck pain with an aching, sharp, pressure-like quality. It was essentially unchanged since the last visit. X-rays revealed adequate fusion and normal alignment. At that time, Dr. Rodriguez-Cruz diagnosed her with post-laminectomy syndrome of the cervical region. He prescribed a TENS Unit and instructed her to follow up with her personal physician. (Tr. 564-565, 665-666).

Ms. Gentry was seen by Dr. David Gaw, an orthopedic surgeon in Nashville, Tennessee, for an independent evaluation on September 19, 2007. Dr. Gaw noted he had the benefit of reviewing all the medical records and reports from the treating physicians related to her work-related neck and right upper extremity injuries, as well as the records of Dr. Gregory Roberts related to her left shoulder complaints following a motor vehicle accident of on or about May 28, 2005. She had tenderness over the brachial plexus on the right more than left and she reported paresthesias into the right arm. There was functional range of movement of the neck. However, there was moderate loss of rotation and extension. Dr. Gaw reflected that while Ms. Gentry's symptoms improved following the surgery by Dr. Rodriguez-Cruz on October 12, 2006, she subsequently developed recurring pain and stiffness in her neck along with aching and tingling in the right upper extremity. Dr. Gaw diagnosed her with a post-operative C5-6 anterior discectomy and fusion and chronic pain syndrome, with the recommended type of treatment being pain management type treatment. Dr. Gaw also indicated that pain would be the limiting factor on her activities. He noted that she had a definite ongoing problem dating back to at least March of 2004 when the MRI scan was done. The September 2, 2005 incident at work simply aggravated and accelerated the pre-existing problem involving her neck. The motor vehicle accident in May of 2005 resulted in pain involving the left upper extremity but those symptoms subsided. Based upon review of the records regarding that accident, it did not appear that the MVA would have resulted in a significant ongoing problem

with her neck. He noted that it appeared that the onset of the numbness in mid-2002 was most likely related to the cervical spine. Pain was the limiting factor on her activities. He gave a 25% PPI to the whole person. She fit into DRE Category IV on Page 392 according to the protocol of the Fifth Edition of the AMA Guides. (Tr. 657-661).

State agency medical consultant, Frank R. Pennington, M. D., opined on September 20, 2007 that Ms. Gentry retained the residual functional capacity to perform medium work. Reaching in all directions (including overhead) was limited to frequent. She was also limited to frequent climbing, balancing, stooping, kneeling, crouching and crawling. (Tr. 555-562).

Treatment notes from Dr. Jain dated October 11, 2007 indicate symptoms of joint pain, which was constant and had been occurring over the past year. The joint pain was described as severe and keeps her awake at night. She had decreased range of motion of her spine and painful movements. Paraspinous muscle spasm and tenderness was noted over the thoracic vertebra with an assessment of osteoarthrosis, generalized, involving multiple sites. (Tr. 584, 587, 639-642, 830-831). (Tr. 903-904).

On October 17, 2007 and October 22, 2007, she was treated by Dr. Jain for benign essential hypertension and shortness of breath. (Tr. 586). Lisinopril was prescribed. (Tr. 637). An electrocardiogram revealed low voltage pre-cordial lead. The chest x-ray revealed old granulomatous disease. A pulmonary function test or CT was recommended. (Tr. 638).

Ms. Gentry was again seen by Dr. Rodriguez-Cruz on November 1, 2007, at which time she reported that while the preoperative symptoms had resolved, she was experiencing neck pain, paresthesia, and pain in her feet, knees, and fingers. At this time, she also reported having radiating pain into her bilateral shoulder distribution. She rated her pain as severe (7 to 8 of 10). It was constant and fluctuates in intensity. It had an aching and sharp quality and radiated into the bilateral shoulder distribution. The paresthesia developed approximately 6 months prior to this visit. It was localized to both arms and had been slowly worsening. It worsened with sitting and lying for any significant time. It was alleviated by heat and movement. Dr. Rodriguez-Cruz diagnosed her with degeneration of the cervical intervertebral disc and torticollis. He ordered an MRI of the cervical spine. (Tr. 566-568, 667-669, 711-712).

The cervical spine MRI performed on November 9, 2007 demonstrated the presence of the anterior fusion at C5-6. It further demonstrated an osteophyte arising from the joint of Luschka at C6-7 on the right with mild encroachment on the right neural foramina, reflecting a degeneration of her

condition. (Tr. 569, 670, 713).

Ms. Gentry followed-up with Dr. Rodriguez-Cruz on November 14, 2007, at which time she was diagnosed with degeneration of cervical intervertebral disc and post-laminectomy syndrome of the cervical region. Dr. Rodriguez-Cruz again discharged her to follow with her personal physicians. Physical therapy was recommended as well. (Tr. 570-571, 671-673).

Ms. Gentry started physical therapy at Cookeville Regional Medical Center on November 16, 2007 for cervical pain. It was noted that following her surgery she had partial improvement of her pain that gradually returned with increased right arm and some right leg pain. Musculoskeletal findings included extension of 40%, side bend of 40% on the right and 30% on the left; rotation of 80% on the right and 70% on the left. Strength in the right shoulder was 4/5 to 4-/5, elbow 4/5. Right hand grip was moderately weaker than the left. Bilateral shoulders had near normal elevation. She had moderate muscle spasm throughout the neck and posterior shoulders. She complained of numbness in the right arm. She had limited endurance for activities of daily living due to neck and right arm pain. (Tr. 817-819, 890-898).

On November 19, 2007, she returned to Dr. Jain for blood pressure and arthritis. An arthritis panel and blood work was ordered for arthritis. Nerve conduction tests and bone densiometry were planned for paresthesia. Erythromycin and Amoxicillin were ordered for helicobacter pylori infection. A CT of the chest was performed. A pulmonary function test was also ordered. (Tr. 631-634).

On November 27, 2007, a nerve conduction test was normal. (Tr. 635). A normal bone density test was also performed. (Tr. 635-636).

On December 4, 2007, upon return to Dr. Jain for follow up of hypertension and arthritis, Ms. Gentry was assessed with other specified diffuse disease of connective tissue. A nerve conduction study was ordered. Mobic, Ultracet, and Zanaflex were prescribed. She was assessed with arthropathy involving multiple sites, fibromyalgia, and Barrett's esophagus. Restoril and Neurontin were prescribed for arthropathy. Tramadol was prescribed for fibromyalgia. Lisinopril was prescribed for hypertension. Prilosec was prescribed for Barrett's esophagus. An attended sleep study was ordered as well. She was educated on systemic lupus erythematous. (Tr. 628-630).

On December 18, 2007, she returned to Dr. Jain for follow up of hypertension and arthritis. She was assessed with arthropathy involving multiple sites, fibromyalgia, hypertension, Barrett's esophagus and insomnia with sleep apnea. Restoril and Neurontin were prescribed for arthropathy.

Tramadol was prescribed for fibromyalgia. Lisinopril was prescribed for hypertension. Pepcid was prescribed for Barrett's esophagus. An attended sleep study was ordered as well. (Tr. 625-627).

On January 7, 2008, Ms. Gentry was discharged from physical therapy at Cookeville Regional Medical Center. Her pain level was a 3 of 5 of 10, down from an 8 of 10. She continued to have good and bad days with pain but she was a lot better overall. She received a home exercise program, therapeutic exercise range of motion, postural strengthening, home exercise instruction, electronic stimulation, cervical traction and home traction. She had near full cervical range of motion with continued moderate muscle spasm. She had good improvement with therapy overall. She was discharged because her progress had plateaued and discharge was requested. She was to continue home exercise and traction. (Tr. 806-815, 880-889).

On January 17, 2008 the state agency consultants opined that Ms. Gentry retained the residual functional capacity to perform medium work. Reaching in all directions (including overhead) was limited to frequent. She was also limited to frequent climbing, balancing, stooping, kneeling, crouching and crawling. (Tr. 573-580).

On March 26, 2008, she returned to Dr. Jain for follow up on hypertension, coughing and choking. She was assessed with insomnia with sleep apnea, hypertension, transient arthropathy involving multiple sites, Barrett's' esophagus, allergic rhinitis due to pollen and other specified diffuse diseases of connective tissue. Restoril, Ambien, Tramadol, Mobic, Tylenol Arthritis Extended Relief, Pepcid, Neurontin and Hydroxyzine were prescribed. (Tr. 622-624).

Treatment notes from Dr. Jain dated July 8, 2008 reflect symptoms of hypertension, arthritis pain, insomnia, and a history of neck surgery with choking feeling. (Tr. 584, 619-621).

On July 14, 2008, an x-ray of the cervical spine revealed previous lumbar fusion at C5-6; degenerative disc disease at C6-7; and bilateral foraminal narrowing. X-ray of the upper GI tract revealed normal esophagram without evidence of reflux. (Tr. 618, 867-871).

On July 29, 2008, she returned to Dr. Jain for difficulty swallowing and neck pain. She was assessed with Barrett's esophagus and cervical disc disorder with myelopathy. Prilosec and Hydrocodone were prescribed. (Tr. 615-618).

On July 14, 2008, she went to Cookeville Regional Medical Center for trouble swallowing. A barium esophagram was normal without evidence of reflux. (Tr. 794). X-ray of the cervical spine was performed due to neck pain. It revealed previous fusion at C5-6; degenerative disc disease at C6-7; and bilateral neuroforaminal narrowing. (Tr. 584, 796).

Office notes from Dr. Jain dated August 29, 2008 reflect complaints of difficulty swallowing and hypertension. The difficulty swallowing had been constant and persistent for the past year. She had difficulty swallowing both liquids and solids, and this was associated with neck pain. (Tr. 584, 609-611).

She returned to Dr. Jain for follow up on September 29, 2008. She was assessed with benign essential hypertension, cervical disc disorder with myelopathy and insomnia with sleep apnea. Hydrocodone, Baclofen, Doxepin, Flagyl and Clarithromycin. (Tr. 583, 596-598, 612-613).

Treatment notes from Dr. Jain dated November 12, 2008 revealed complaints of neck pain since 2005. She also had problems of a choking feeling and hoarseness in her throat. She reported difficulty swallowing associated with neck pain. It was noted that she had fusion surgery in 2006 and needed pain management. (Tr. 584, 606-608).

Treatment notes from Dr. Jain dated December 17, 2008 documented ongoing symptoms of arthritis pain, hypertension, and insomnia. Her arthritis pain had been increasing over the past five years. Painful movements and tenderness were noted in the cervical spine. Range of motion decreased in the spine and movements were painful. She was noted to have paraspinous muscle spasms and tenderness over the thoracic vertebra. Laboratory results revealed positive (abnormal) H. Pylori and a diagnosis of diseases of the esophagus or Barrett's esophagus. (Tr. 584, 603-605).

She returned to Dr. Jain on January 16, 2009 and January 30, 2009. On January 16, she was assessed with Barrett's esophagus and an upper GI was recommended. Flagyl and Clarithromycin were prescribed for a bacterial infection, H. pylori. (Tr. 602). She was assessed with acute sinusitis, cervical disc disorder with myelopathy and insomnia with sleep apnea. Lisinopril, Hydrocodone, Baclofen, Doxepin and Ambien were prescribed. (Tr. 583, 596-600).

Treatment notes from Dr. Jain dated March 27, 2009 indicate complaints of arthritis. Her pain was a severe, dull ache and she suffered from insomnia or disturbed sleep which resulted in approximately one to four hours of sleep per night associated with fatigue, irregular hours of sleep and restlessness. Movements were painful and she was tender in the cervical spine. Range of motion was decreased. She was assessed with benign essential hypertension, cervical disc disorder with myelopathy and insomnia with sleep apnea. Lisinopril, Hydrocodone, Baclofen, Doxepin and Ambien were prescribed. (Tr. 583, 596-598).

On April 28, 2009, she returned to Dr. Jain for hypertension and difficulty swallowing. She was assessed with cervical disc disorder with

myelopathy, insomnia, and Barrett's esophagus. Hydrocodone, Baclofen, Doxepin, and Ambien were prescribed. (Tr. 594).

Treatment notes from Dr. Jain dated June 30, 2009 reflected symptoms of neck pain and stiffness along with difficulty swallowing. She described her level of pain as a seven of ten. Palpations were also noted. Screening was recommended for rheumatoid arthritis. She had painful movements of the cervical spine and decreased range of motion. Paraspinous muscle spasms were present along with tenderness over the thoracic vertebra. Review of systems, psychiatric, was notable for a change in sleep pattern and depression. She was assessed with cervical disc disorder with myelopathy. (Tr. 583, 590-592).

A chest x-ray was performed on July 2, 2009. It revealed old granulomatous disease. A pulmonary function test was recommended. She had atherosclerotic vascular disease. Bony structures seemed to be well mineralized, though a bony density might be more helpful. (Tr. 592).

An echocardiogram was performed on July 9, 2009. A 24-hour Holter monitor was normal. (Tr. 592).

Treatment notes from Dr. Jain dated July 20, 2009 reflect that Ms. Gentry presented with symptoms of arthritis, pain in her neck, bilateral hands, and feet with swelling lasting for the past 2 years. She reported her pain was increasing and was at a level 9 on a scale of 1 to 10, with 10 being the worst. Symptoms were also significant for high blood pressure, asthma, heartburn, anxiety, and insomnia. She did not feel well and had a decreased energy level. She was sleeping poorly. She slept on average 2 hours per night. Her insomnia had persisted for the past 2 years, intermittently and recurrently. She complained of severe arthritis, which had been gradual, persistent, and increasing over the past 5 years. Neck stiffness was described as severe with decreased movement from side to side and pain radiating to her bilateral hands with numbness. Edema was noted to the hands and feet and had been persistent for the past 2 years. Anxiety had been persistent and constant for the past 2 years and was characterized as nervousness, with associated memory loss. Current problems included anxiety, change in bowel habits, constipation, chest pain, cough, depression, difficulty sleeping, dizziness, edema, fatigue, headache, hoarseness, hypertension, indigestion, joint pains, low back pain, memory loss, myalgia, neck pain, nervousness, night sweats, pain, and palpitations. On examination, she was noted to be in pain. She had an ongoing pain problem with her neck, back, arms and hands. Her movements were slow. (Tr. 423-466, 582-583, 588-589).

Dr. Jain opined in his July 20, 2009, Statement of Ability to Do Work-Related Activities form, that Ms. Gentry suffers from the following

limitations: She can occasionally lift and/or carry (including upward pulling) less than 10 pounds. She can carry up to 5 pounds for 2 hours per day. She can frequently lift and/or carry less than 10 pounds. She can carry around 5 pounds for maybe 2 hours a day. She can stand and/or walk at least 2 hours in an 8-hour workday, with normal breaks. She can sit less than about 6 hours in an 8-hour workday, with normal breaks. She must periodically alternate sitting and standing to relieve pain or discomfort. She is limited in her upper extremities as well as her lower extremities. She has arthritis of the hands and fusion in the neck. She has weakness in the hands when lifting and opening bottles. She states that she has neuropathy with numbness in both feet, which interferes with pushing, pulling, and balancing. As to what clinical findings support his conclusions listed above, Dr. Jain indicated that Ms. Gentry has had a lupus test done which showed positive for anti-nuclear antibodies (ANA) and positive C - reactive protein. She stated she has fibromyalgia. She has swelling of the hands with arthritic changes of the distal interphalangeal joints. She has fusion of the C5-6 cervical vertebrae due to degenerative disc disease and had bone placed from bone banks. She continued to have pain in the neck with x-rays suggestive of degenerative discs at multiple levels. (Tr. 275-276). She can occasionally perform the following postural activities: climbing (ramps/stairs/ladders/ropes/scaffolds), balancing, kneeling, crouching, crawling, and stooping. As to what clinical findings support these conclusions, Dr. Jain reports that Ms. Gentry has degenerative disc disease of the spine with fusion of C5-6 vertebrae with neuroforaminal compromise and neuropathy involving both upper and lower extremities. She has positive antinuclear antibodies. She is limited in reaching in all directions, including overhead; limited in handling or gross manipulation; limited in fingering or fine manipulation. Reaching can be performed frequently, handling only occasionally, and fingering frequently. Dr. Jain explains that she has neuropathic pain with loss of strength in her arms and hands. She complains of numbness in the hands and fingers, and sometimes things drop out of her hands. She cannot open jars and lids due to the inherent weakness for the past 4 years. Environmental limitations caused by the impairment include temperature extremes, vibration, humidity/wetness, and hazards (machinery, heights, etc.). She states that change of temperature, vibration, humidity, and wetness cause her arthritis and fibromyalgia to act up and get worse. She is scared of heights as she has little control of her hands and feet due to the neuropathy with numbness and weakness. (Tr. 651-654, 675-679).

      She underwent physical therapy in late 2009 and early 2010. Notes show that she had minimal loss of movement at flexion, moderate loss at

protrusion or retraction, and major loss at extension. She has some pain. However, she reported her pain decreases for approximately 4 hours after treatment, but it is dependent on her activity level. (Tr. 680-682).

Treatment notes from Dr. Urban in October 2009 show she reported her average severity of pain is 9 of 10, and it occurred 100% of the time she was awake. She reported her pain was made worse by "everything" and improved by "nothing specific". Her pain control was currently inadequate. Lortab 7.5/500 four times daily as needed for pain, Baclofen 20mg four times daily, Flector Patch to be applied twice daily to areas of pain, continue home TENS unit to help relieve myofascial pain and consider anti-convulsants. (Tr. 727-728).

At a follow-up visit with Dr. Urban for chronic pain management on December 9, 2009, she stated her pain was only "dull", and its average severity was rated a two of ten. It continued to occur 100% of the time while awake. It was being treated with medications, home exercises and TENS Unit. She stated this was providing adequate pain control. She was able to be independent with activities of daily living. . She was having a difficult time with muscle tightness that was unrelieved with current treatment. Lortab 7.5/500 four times daily as needed for pain, Baclofen 20mg four times daily was changed to Amrix 15mg at night, Flector Patch to be applied twice daily to areas of pain, and Zonegran 100 mg were prescribed. She was to continue home TENS unit to help relieve myofascial pain. She was to start physical therapy for myofascial release and return in two months. (Tr. 725-726).

On January 13, 2010, Ms. Gentry had a physical therapy report that stated she had been to twelve physical therapy visits. Her pain had not improved since beginning therapy. However, her pain decreased for approximately four hours after treatment but was dependent on activity level. (Tr. 715).

On February 3, 2010, she reported her chronic pain had risen to a six of ten. She complained to Dr. Urban of neck pain, generalized joint pain and generalized nerve pain. Her pain occurred 100% of the time while she was awake. The impression was cervical ACDF, cervical stenosis, cervical spondylosis, and she had been placed at MMI and received an IR. She was on lifetime medical from her workers compensation case. She was encouraged to remain active and to avoid a sedentary lifestyle. She was to continue towel stretch exercise (handout given). Lortab 7.5/500 four times daily as needed for pain, Amrix 15mg at night, Flector Patch to be applied twice daily to areas of pain, continue home TENS unit to help relieve myofascial pain. She had used physical therapy and it seemed to have helped. Zonegran 100 mg was

prescribed. She was referred to Kerri Becht for physical therapy for myofascial release. She was to return to the clinic for re-evaluation in two months. (Tr. 722-724).

On February 19, 2010, an uncomplicated ultrasound guided left breast cyst aspiration was performed at Cookeville Regional Medical Center. (Tr. 780-785, 851-858).

On May 26, 2010, Ms. Gentry went to Dr. Steven Urban for neck pain, mid-back pain and low back pain. She described her pain as a 7 of 10 in intensity. She had pain 60% of the time she was awake. Her pain was made worse by sitting, walking and bending and better by lying down and exercising. She was assessed with cervical spondylosis, cervical spinal stenosis, and cervical post-laminectomy syndrome. Amrix, Lortab, Zonegran and Flector were prescribed. (Tr. 692-693). Physical therapy was recommended to include myofascial release for cervical strain. Treatment was recommended for two to three times a week for four to six weeks. (Tr. 689-690).

On August 25, 2010, she reported her neck pain was a nine of ten for 100% of the time. She stated that the pain was made worse by sitting and standing from a seated position, bending, and lifting. She stated that the pain was made better by lying down and exercising. Pain therapies or treatments undertaken by Ms. Gentry since her last visit included medications and TENS unit use. She reported that currently her pain was inadequately controlled. Her usual highest daily level of activity was being independent for all activities of daily living. She reported that her condition was worsening. She had not had any medications because workers compensation WC had not been paying for them. She admitted depression. Kyphosis was present. She had bilateral paraspinal tenderness to palpation and bilateral myofascial tenderness to palpation. She was assessed with cervical spondylosis, cervical spinal stenosis, and cervical post-laminectomy syndrome. Flexeril, Amrix, Lortab, Zonegran and Flector were prescribed. (Tr. 686-688).

Donita Keown, M.D. performed a consultative examination on November 2, 2010. She reported pain in her joints and constant neck pain radiating into the bilateral upper extremities to the level of the hands encompassing all surfaces with continued tingling, numbness, and pain. She complained of being tested positive "on and off" for systemic lupus for "years". She complained of fatigue. Dr. Keown noted that she appeared "about 20 years younger" than her actual age. It was noted that the effort provided was unreliable. On exam, she showed full range of motion in bilateral shoulder joints, elbows, wrists, hands, hips, knees and ankles. There were noted Heberden's nodules on the distal interphalangeal joint on left and right hand, and artificial nails had been applied with an adhesive on the bilateral hands.

Regarding the cervical spine, upon exam, she did not rotate, extend or flex. It was noted that when adjusting articles of clothing, conversing, or moving hair, she showed rotation right to 60 degrees and left to 50 degrees. She would not participate for dorsiflexion. It was noted that during another time of the exam, she actively performed dorsiflexion in a position of 75 degrees in no apparent distress. Straight leg raises were negative. Measured bilateral hand strength was 1 + to 2/5. Dr. Keown noted those results were "clearly inconsistent" with observations of her ability to manipulate articles of clothing, door knobs, and writing utensils. Motor strength in the upper extremities graded 2/5, but Dr. Keown noted this was "unreliable". Motor strength testing in the lower extremities showed 2+/5. Dr. Keown again noted that this was unreliable and inconsistent with her ability to ambulate independently and stand on one foot. She performed an unreliable straightaway walk. She moved from seated to standing position unremarkably. She got onto and off of the examining table unremarkably. She was assessed with chronic neck pain, status post anterior fusion, C5-C6, in the remote past and systemic lupus erythematous by history. (Tr. 734-737).

She was seen by Crystal Parrish, Nurse Practitioner at Tennessee Pain Management, on November 17, 2010 for neck pain, mid back pain and low back pain. She described the pain as aching; shooting, stabbing, throbbing, burning, and numb. She states that her pain level is a 4/10 on average ("0" meaning no pain; "10" meaning the worst pain of their life). She had pain 100 percent of the time that she is awake. She stated that the pain was made worse by standing from a seated position, walking, bending, and lifting and the pain was made better by lying down. She admitted depression. She had bilateral occipital tenderness to palpation on exam of the cranium. She had bilateral paraspinal tenderness to palpation, bilateral myofascial tenderness to palpation, spinal tenderness to palpation (lower segments), no paraspinal tenderness, and bilateral myofascial tenderness to palpation. She was assessed with occipital neuralgia (Cervical region syndrome); cervical spondylosis; cervical spinal stenosis; cervical post-laminectomy syndrome; and thoracalgia (thoracic pain). Zanaflex, Flector, Lortab, Zonegran, Amrix and Flexeril were prescribed. She was encouraged to remain active with a home exercise program. A urine drug screen was performed. She was to follow up in Lebanon for an occipital nerve block. (Tr. 963-964).

On January 17, 2011, she went to Dr. Thuy Ngo for evaluation of intractable arm pain. She reported chronic neck and shoulder pain, initially on the right side. Pain was not alleviated by cervical laminectomy and she further developed pain down both arms. She had numbness and tingling in the hands,

worse on the right. She woke at night with numbness and pain. She had noted stiffness and loss of grip in her hands. She had numbness and tingling in her feet. Her legs were weak and gave way. She had hypertension and gastric reflux. She was taking Cymbalta, Doxepin, Hydrocodone and Tizanidine. The impression was bilateral carpal tunnel syndrome, peripheral neuropathy, rule out cervical myelopathy status post cervical laminectomy, and rule out generalized myofascial pain disorder. A cervical MRI was recommended as well as an EMG and blood work. (Tr. 749-750).

MRI of the cervical spine revealed cervical spondylosis at C6-7 on the right and anterior fusion at C5-6. (Tr. 906).

On January 21, 2011, Ms. Gentry went to Dr. Thuy Ngo at Cookeville Neurology for evaluation of intractable arm pain. She reported having chronic neck and shoulder pain, initially on the right side. She said that she underwent cervical laminectomy in 2007 and pain was not alleviated. She further developed pain down both arms. She had numbness and tingling in her hands, worse on the right side. She woke up at night with numbness and pain. She had numbness and tingling in her feet. Her legs were weak and gave way. She had hypertension and gastric reflux. She was taking Cymbalta, doxepin, hydrocodone, and Tizanidine. Detailed neurologic review of systems was otherwise unremarkable. Stocking sensory loss was present. (Tr. 749). She was diagnosed assessed with probable peripheral neuropathy associated with bilateral carpal tunnel syndrome. A cervical MRI was to be repeated to rule out myelopathy given her complaints of leg weakness. Blood tests and EMG's were to be obtained to evaluate inflammatory muscle and nerve diseases. She was started on Neurontin gradually for pain control. Cymbalta was continued. (Tr. 750). EMG was performed on January 24, 2011 revealing mild bilateral carpal tunnel syndrome, worse on the left than the right. (Tr. 751, 754).

On January 28, Ms. Gentry went to Stacy Brewington, M. D. at Tennessee Heart for palpitations that occurred at night. She had joint pain, stiffness, weakness, numbness, tingling and muscle pain. She reported a loss of energy, fluttering and racing heart beats, indigestion and constipation. Her thyroid tests were normal and an exercise treadmill test was said to be abnormal with 2-3 mm of ST depression in the inferolateral leads. The exercise time was almost 10 minutes and she denied chest pain but got short of breath during exercise. (Tr. 917-926).

On February 9, 2011, she returned to Tennessee Pain Management. She reported her pain was at a 4/10, and that her pain was adequately controlled. Her diagnoses and medications were unchanged. A TENS unit was again ordered. (Tr. 965-966).

On March 25, 2011, Ms. Gentry started seeing Dr. Viswa Durvasula with complaints of depression, anxiety, decreased sleep, energy level, irritability and mood swings. She was stressed with finances and said she had some depression in the past, but since she stopped working she had been progressively getting worse. She was treated with Doxepin, Cymbalta, and Klonopin by her PCP, Dr. Jain, but she said she continued to be depressed and decided to get help. She said she gets frustrated very easily and gets irritable and angry. She was depressed, anxious and irritable on exam. She was diagnosed with major depression, moderate, recurrent and generalized anxiety disorder. A GAF of 50 was assigned with 55 being the highest over the past twelve months. She was started on Prozac and Klonopin during the daytime. She was to stop Doxepin and continue with Ambien. She was advised to cut down on her caffeine intake and return in one month or earlier as needed. (Tr.756-757, 927-929).

On April 13, 2011, she went to Cookeville Regional Medical Center for abnormal EKG palpitations and hypertension. Exercise treadmill test was normal at high workload. She had normal left ventricular function with an ejection fraction of 84%. SPECT images showed no myocardial ischemia. (Tr. 759, 832-834).

She returned to Dr. Durvasula on April 25, 2011. She was stressed, anxious and depressed. She was dealing with family issues but her own health problems and chronic pain issues were "pulling her down and making her depressed." She was taking Ambien and one Klonopin at bedtime and still not sleeping well. Ambien was stopped and she was started on Restoril and Klonopin, alternating at bedtime. (Tr. 930).

She returned to Cookeville Medical Clinic on May 4, 2011 for neck pain and mid back pain. She rated her pain an 8 of 10 occurring 90 percent of the time. Her usual highest daily level of activity was being partially dependent but able to bath, dress and feed herself. She still had not received her TENS unit. Exam was unchanged and Neurontin and Lidoderm were prescribed. (Tr. 969-970).

Ms. Gentry returned to Dr. Durvasula on May 23, 2011. She was still not sleeping well and preferred to go back to Ambien. Her chronic pain issues continued to bring her down. She said she did better on Cymbalta. If it was not approved through the company she wanted to stay on Prozac. (Tr. 931-932).

On June 1, 2011, she returned to Tennessee Pain Management. She reported pain at 7/10. Her chief complaint included neck pain, mid-back pain, abdominal pain, generalized joint pain, generalized muscle pain, and generalized nerve pain. Her diagnosis was unchanged. A left then right

occipital nerve block was ordered. Meloxicam and Soma were prescribed. Lidoderm and Neurontin were adjusted. Flector and Zanaflex were discontinued. (Tr. 971-973). A TENS unit was ordered again and Neurontin was slowly increased over a week. (Tr. 973).

On June 29, 2011 she returned to Tennessee Pain Management for mid-back pain, low back pain, abdominal pain, generalized joint pain, generalized muscle pain, and generalized nerve pain. She reported pain at a 9 of 10 in intensity. She was assessed with occipital neuralgia, cervical spondylosis, cervical spinal stenosis, cervical post-laminectomy syndrome, and thoracalgia. An IM injection of Toradol was written for exacerbation of chronic pain. A weekly Butrans Transdermal Patch weekly was ordered, in addition to Miralax and Soma. She was encouraged to remain active with a home exercise program. (Tr. 975-976).

In June 2011, Dr. Jain completed a second medical source statement limiting Ms. Gentry to less-than-sedentary exertion. Dr. Jain opined in his June 2011 Statement of Ability to Do Work-Related Activities form, that Ms. Gentry suffers from the following limitations: She can occasionally lift and/or carry (including upward pulling) less than 10 pounds. She can carry up to 5 pounds for 2 hours per day. She can frequently lift and/or carry less than 10 pounds. She can carry around 5 pounds for maybe 2 hours a day. She can stand and/or walk at least 2 hours in an 8-hour workday, with normal breaks. She can sit less than about 6 hours in an 8-hour workday, with normal breaks. She must periodically alternate sitting and standing to relieve pain or discomfort. She is limited in her upper extremities as well as her lower extremities. She has arthritis of the hands and fusion in the neck. She has weakness in the hands when lifting and opening bottles. She states that she has neuropathy with numbness in both feet, which interferes with pushing, pulling, and balancing. Dr. Jain indicated that Ms. Gentry has had a lupus test done which showed positive for anti-nuclear antibodies (ANA) and positive C - reactive protein. She has swelling of the hands with arthritic changes of the distal interphalangeal joints. She has fusion of the C5-6 cervical vertebrae due to degenerative disc disease and had bone placed from bone banks. She continued to have pain in the neck with x-rays suggestive of degenerative discs at multiple levels. (Tr. 275-276). She can occasionally perform the following postural activities: climbing, balancing, kneeling, crouching, crawling, and stooping. She is limited in reaching in all directions, including overhead; limited in handling or gross manipulation; limited in fingering or fine manipulation. Reaching can be performed frequently, handling only occasionally, and fingering frequently. Ms. Gentry has neuropathic pain with

loss of strength in her arms and hands. She complains of numbness in the hands and fingers, and sometimes things drop out of her hands. She cannot open jars and lids due to the inherent weakness for the past 4 years. Environmental limitations caused by the impairment include temperature extremes, vibration, humidity/wetness, and hazards (machinery, heights, etc.). She has little control of her hands and feet due to the neuropathy with numbness and weakness. (Tr. 957-961).

On August 29, 2009, a final order was entered in her workers comp claim for injury to Sharon Gentry's neck, right shoulder and right upper extremity that occurred while in the course and scope of her employment with TRW Vehicle Safety Systems, Inc. The parties had agreed to settle this claim based upon a settlement of 65% permanent partial disability to the body as a whole or Eighty-Eight Thousand Six Hundred Sixty-Two and 60/100 ($88,662.60) Dollars. The parties further agreed that she was entitled to future medical benefits in accordance with the Worker's Compensation Statutes of the State of Tennessee provided she sees the authorized and designated treating physician. (Tr. 216).

## HEARING TESTIMONY
### Original Hearing dated August 14, 2009

At the hearing on August 14, 2009, Ms. Gentry testified that she last worked in 2006. She is 5'6" and weighs 192 pounds. She is right handed, has a current driver's license, and has completed high school. She lives with her 23-year old daughter and her husband. (Tr. 63, 67). She has no hobbies. (Tr. 67). She left work at TRW because the plant moved to Mexico. She testified that she is no longer able to work because she has a lot of pain in her neck and upper and lower extremities, does not have any strength in her hands, and has neuropathy in her feet. (Tr. 63). She had a fusion surgery in 2006 and it got a little better, but it never did get back to normal and she is still in pain. She has pain in her neck all the time and the weather plays a lot into when her pain is worse. (Tr. 64). Her medication makes her drowsy. She stated that she also has problems with her hands and feet. (Tr. 65). She had surgery on her foot, where they took a nerve out in 2006, which had some improvement. However, when she stands she gets a constant burning feeling. During the day she uses a TENS unit and a stimulator in her neck. She then takes medications and lies down. Her neck is so stiff that she has trouble moving it from left to right. On the pain scale her neck pain is at a 10 and she has to take pain medication daily. The pain affects her ability to concentrate and to finish what she starts. (Tr.

68-69). She also has a constant pain in her back. (Tr. 69). She has a lot of pain in her neck when she uses her arms to reach to her side and reaching overhead. She has constant numbness in her arms, hands, and lower extremities. She could probably only lift under five pounds around the home. She would not be able to do so five days per week, 8 hours per day. (Tr. 70). Pushing/pulling cause her to have a lot of pain in her neck and body. (Tr. 71). She can only sit for about an hour at a time without pain unless she has taken pain medication. She uses a TENS unit to relax her muscles in her neck on a daily basis. (Tr. 71). She did not feel like she could do her past work on an assembly line or as a waitress. She had problems moving her neck and being able to stand long periods of time on her feet. Additionally, she had no strength in her hands and arms. She testified that she is unable to do her laundry and that her husband and daughter pick up a lot of activities she once did around the home. She was in pain while sitting at the hearing. (Tr. 72). She is always fatigued and has no energy. She has been prescribed medication for depression. She has several bad days when she doesn't even want to get out of bed. (Tr. 73). She has to take frequent rest periods during the day. She feels like she has a "crick" in her neck most of the time – sometimes every day. She feels like she has flu-like symptoms. In an eight-hour day she will take about six to seven five to ten minute rest breaks. (Tr. 73). Her pain was pretty consistent from the time of her injury until the time of her hearing. (Tr. 75). She went to Dr. Cruz, neurologist. She had seen Dr. Jain on and off for the past four years after losing her insurance when she left TRW. (Tr. 76).

Her husband, Kenneth Gentry, also appeared and testified. He stated that he has been married to her for 32 years and does not disagree with anything she testified to. He stated that she has a lot of problem getting the housework done and lots of days she stays in her pajamas. (Tr. 77). She can't stand or sit for long periods of time and she gets up and down all night. Since her surgery she has gotten worse and she can't do what she used to do as far as housework and activities. Their daughter has stepped in to help around the home a lot. (Tr. 78).

At the hearing the vocational expert, Edward Moffett, classified Ms. Gentry's past relevant work as that of a waitress (light/semi-skilled) and factory worker/assembler (light/unskilled). He testified that a hypothetical individual of her age, education, past work experience, and residual functional capacity would be unable to perform any of her past relevant work. (Tr. 79-80, 101).

If the individual suffers from severe pain on a daily or almost daily basis, to the point that she is unable to concentrate in a way that would allow

her to complete an eight-hour day on a regular basis, she would be unable to perform the duties and responsibilities of any job stated above, or for that matter, any job in the local or national economy. She would be unemployable. (Tr. 82). If the VE assumed further that Ms. Gentry's conditions would result in her missing at least two to three days per month her employability would be affected. (Tr. 82).

## Subsequent Hearing Dated July 19, 2011

Ms. Gentry was 53 years old at the time of the second hearing. (Tr. 33). Her constant pain since her surgery ran down into her back and arms with tingling. Right after the surgery, the tingling went away but she had numbness and stiffness in her back that gradually worsened. The pain was still bothering her at her six week check-up with Dr. Cruz, but that she was on pain medications at that time. (Tr. 37). She went back to Dr. Cruz about her pain but was told that it would be something she would have to deal with. The surgery helped a little because she was in constant pain and was unable to move her neck prior to surgery. She was able to move her neck after surgery and at the time of the hearing. She demonstrated how far she could move her neck. (Tr. 38). She has trouble looking beside her or behind her while driving. She uses her mirrors to compensate for her lack of motion in her neck. She sees Dr. Steven Urban for pain in her neck and back. She sees her family physician for arthritis and problems like that, and Dr. Durvasula for depression and anxiety. She had suffered from depression and anxiety since she had the fusion in her neck and she became unable to work. (Tr. 39). She was on medications for depression and anxiety. She was having problems with her shoulders. She had received shots in her shoulders. At first she was told she had bursitis, but then she was told she had degenerative disc disease. Her medications made her very sleepy. It rained the day before and she was in pain all day long and had to take a lot of pain medication. (Tr. 40). She experienced pain on a daily basis. In addition to the weather worsening her pain, it is worsened by overexertion. (Tr. 41).

In a typical day, she takes about an hour to get up and going because she had been having a lot of trouble with neuropathy in her feet and legs. She will then fix a bowl of cereal. If her daughter puts a load of clothes on the table she will try to fold it. Two days prior to the hearing, she was in pain and had stayed in bed most of the day. Over the prior month, she had had to lay down three to four hours every day. She testified that her daughter and husband worked and that was how she had been supported. She had no

hobbies. (Tr. 42). After she cooks a large meal, her pain will worsen from overexertion. (Tr. 43). Peeling potatoes and holding a skillet would aggravate her. Her fingers had knots and inflammation. Her four fingers had more inflammation than her thumb. (Tr. 44). The fingers were more swollen in the knuckles. She had been diagnosed with lupus and arthritis. She takes Plaquenil for those conditions and has some blurred vision and feels tired from the medication. (Tr. 45). She has a lot of numbness in her arms. She suffers from decreased strength in her hands in addition to neuropathy in her feet. (Tr. 46-47). She has difficulty holding utensils and opening bottles. She has difficulty nodding her head down toward her chest, which causes a shooting back pain. When she tries to put her head toward her back, she has a lot of stiffness and popping. (Tr. 47). When she wakes in the morning, it feels like her legs are giving way and going numb. She had this problem for a couple of years but it had really gotten worse over the previous year. (Tr. 48). She has problems with balance and falling.

She sees Dr. Durvasula for depression. Prior to that, she had been getting medication for these conditions. Dr. Durvasula put her on Cymbalta, Klonopin, Zolpidem, and Prozac. (Tr. 49). She felt that the Cymbalta helped with the pain but it made her feel bad, like "I'm in another world." She was told she would have to take it for a year before her body was used to it. (Tr. 50). She testified that she has problems with concentration and memory. She has problems keeping focused on a television show. She was up and down all night before starting sleep medication. She was able to sleep until about 4:00 a.m. with the sleep medication. It takes her about two hours to go back to sleep. (Tr. 51). She gets up between 9:00 and 10:00 a.m. She tries to wash dishes that are in the sink, but her daughter helps a lot. Her husband and daughter grocery shop. She attends church. (Tr. 52). Her back becomes stiff while sitting through church. She takes her pain medication before she goes. She had taken her pain medication prior to the hearing. (Tr. 53).

### III.  Conclusions of Law

#### A.  Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied.  Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003).  "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)).  Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached.  Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

#### B.  Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  Id. at § 423(d)(3).  In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

      The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE")

testimony.  See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4

(S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the

analysis required at steps four and five above, the SSA is required to consider the combined

effect of all the claimant's impairments, mental and physical, exertional and nonexertional,

severe and nonsevere.  See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483,

490 (6th Cir. 1988).

## C.  Plaintiff's Statement of Errors

Plaintiff alleges error in the ALJ's treatment of her treating physicians'

opinions; in her finding that plaintiff's mental impairment was not severe; and, in her

rejection of plaintiff's subjective complaints of pain.  For the reasons that follow, the

undersigned finds no such error in the decision below.

### 1.  Drs. Rodriguez-Cruz and Jain

Plaintiff argues that the ALJ erred in failing to consider the treatment notes of

her neurosurgeon, Dr. Rodriguez-Cruz, which postdate his opinion letter of January 5, 2007.

In that opinion letter, Dr. Rodriguez-Cruz observed as follows:

> I saw Mrs. Gentry back and she is doing extremely well.  Her arm pain and
> arm numbness are both gone.  She says she still has a little bit of stiffness in
> her neck and I explained to her that is expected after a cervical fusion.  Her
> incision is just about invisible to see.  On exam today her trace brachialis
> weakness is gone.  She has good pulses.  If she had a job to go back to I would
> send her to it without restrictions, as this is a workman's compensation case I
> would say that her case is closed.  She is ready to go back to any type of work
> without any restrictions and her disability rating according to DRT category
> #4 25% impairment of the whole person, as she has had a successful surgical

arthrodesis and no cervical radiculopathy is present.

(Tr. 482)  Subsequent to the writing of this letter, Dr. Rodriguez-Cruz's notes reflect a diagnosis of degeneration of the cervical intravertebral disc, torticollis, and postlaminectomy syndrome of the cervical region (Tr. 567, 571), as well as MRI results showing Luschka hypertrophy at C6-7 on the right with mild right neural foraminal encroachment (Tr. 569). While plaintiff asserts that the ALJ failed to consider these developments recorded in Dr. Rodriguez-Cruz's notes when weighing the opinion evidence, in fact the ALJ explicitly noted her consideration of this evidence from late 2007.  (Tr. 20)  Her resolution of any conflict created by this evidence is implicit within the larger determination of plaintiff's limitations during and following 2007, involving principally the opinions of plaintiff's treating physician, Dr. Jain, and the consultative examiner, Dr. Keown.  Notably, however, the ALJ made reference to reports from September and November 2007 which show that plaintiff's neck pain was unaccompanied by muscle weakness, sensory loss, or loss of functional range of motion, and was alleviated by heat, postural movement, and exercise.  (Tr. 18)  Moreover, Dr. Rodriguez-Cruz himself prescribed a course of physical therapy in November 2007 to address plaintiff's pain complaints, noting that "[i]n the absence of spinal cord compression or neurologic deficit physical therapy is both safe and effective in treating cervical disc disease."  (Tr. 571)  After a twelve-session course of physical therapy, plaintiff was discharged with "good improvement overall," including a reduction in her subjective pain level from 8 on a 10-point scale, to between 3 and 5.  (Tr. 880)

        With regard to the opinions of Dr. Jain, offered in medical source statements in 2009 (Tr. 651-54) and 2011 (Tr. 958-61), to the effect that plaintiff was limited by her

26

cervical spine and other impairments to less than sedentary exertion, the ALJ found these assessed limitations inconsistent with the bulk of objective observations at other physical examinations, and with the overall weight of the medical opinion evidence and other evidence of record.  (Tr. 20)  Plaintiff argues that Dr. Jain's opinions are sufficiently supported by the other medical evidence and thus deserving of deference in accord with his status as a treating physician.

The medical opinion of a treating source is entitled to controlling weight pursuant to 20 C.F.R. § 404.1527(d)(2) if it is well supported by objective, clinical evidence and not substantially opposed on the record.  Even where such an opinion is not entitled to controlling weight, the Sixth Circuit has stated that "in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference. . . ." Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 242 (6th Cir. 2007). Accordingly, ALJs must provide "good reasons" for discounting the weight of a treating source opinion.  See 20 C.F.R §§ 404.1527(d)(2), 416.927(d)(2); Rogers, 486 F.3d at 242.

Plainly, on this record, the opinions of Dr. Jain are not entitled to controlling weight; it is the presumption of deference due a treating physician which plaintiff argues must carry the day here, in light of support for those opinions found in other medical records proffered by plaintiff, as follows:

> Dr. Jain's opinion is supported by Dr. They Ngo who treated Ms. Gentry for probably peripheral neuropathy associated with bilateral carpal tunnel syndrome.  (Tr. 750)  It is consistent with Dr. [Rodriguez-]Cruz who found Ms. Gentry to have a diagnosis of degeneration of the cervical intravertebral disc and torticollis (Tr. 567), a magnetic resonance imaging (MRI) examination of her cervical spine that showed Luschka hypertrophy C6-7 on the right with mild right neural foraminal encroachment (Tr. 569) and Dr. Rodriguez-Cruz's

diagnosis of postlaminectomy syndrome of the cervical region (Tr. 571). Dr. Jain's opinion is consistent with physical therapy records in 2007 which showed musculoskeletal findings including extension of 40%, side bend of 40% on the right and 30% on the left; rotation of 80% on the right and 70% on the left. Strength in the right shoulder was 4/5 to 4-/5, elbow 4/5. Right hand grip was moderately weaker than the left. Bilateral shoulders had near normal elevation. She had moderate muscle spasm throughout the neck and posterior shoulders. . . . Dr. Jain's opinion is consistent with physical therapy records in late 2009 and early 2010. Notes show that she had minimal loss of movement at flexion, moderate loss at protrusion or retraction, and major loss at extension. She has some pain. However, she reported her pain decreases for approximately 4 hours after treatment, but it is dependent on her activity level. Dr. Jain's opinion is supported by Dr. Greg Roberts who found Ms. Gentry to have cervical spine pain revealed with ROM and X-rays of the left shoulder show a Type I acromion and AC arthropathy. MRI of the left shoulder showed some signal change in the supraspinatus. Her AC arthropathy was present on her MRI. He injected her with 80mg of Depo, 4 cc's of Lidocaine and 4 cc's of Marcaine.

(Docket Entry No. 10 at 24)

In responding to plaintiff's argument, defendant first asserts that Dr. Jain's opinions that plaintiff is limited to less than sedentary exertion are not entitled to weight because they are opinions on the issue of RFC, which is a legal determination reserved to the ALJ. However, this argument is misplaced, since Dr. Jain's opinions merely assessed exertional limitations characterized *by the ALJ* as allowing for less than sedentary exertion. The assessment of exertional limitations is a matter of medical opinion within the domain of the physician, and so was properly given here. Nonetheless, despite some support in the objective medical evidence for the opinions asserted by Dr. Jain, there is also significant evidence which departs from those opinions. Chiefly, Dr. Jain's opinions are opposed by the aforementioned opinion of Dr. Rodriguez-Cruz in early 2007; the opinion of consultative

examiner Dr. Donita Keown in November 2010; and, treatment notes revealing inconsistent examination findings including normal cervical range of motion (Tr. 571, 589, 620, 623, 764, 963, 965, 969, 972, 975), as well as plaintiff's report of dramatic fluctuation in the intensity and persistence of neck pain and the extent to which the pain is controlled by medication and other measures.

Dr. Keown's opinion, in short, leaves no doubt that the examiner believed plaintiff to be malingering, with several notations of her inconsistent effort on formal testing during physical examination, versus observed movements or exhibitions of strength which Dr. Keown recorded. (Tr. 735-36) For instance, with regard to plaintiff's cervical spine, "[d]uring formal examination, she does not rotate, extend, or flex. However, during other periods of time when adjusting articles of clothing, moving hair, conversing, she shows rotation right to 60 degrees, left 50 degrees." (Tr. 736) Similarly, findings on examination of her thoracolumbar column, neurological response, and gait and station revealed the following:

> During formal examination, she does not participate for dorsiflexion. However, during another incidence, she is dorsiflexing in a position of 75 degrees in no apparent distress. . . . Bilateral hand strength is measured as 1+ to 2/5, clearly inconsistent with observations of claimant's ability to manipulate articles of clothing, door knobs, writing utensils, etc. Motor strength testing in the upper extremities graded 2/5, unreliable. Motor strength testing in the bilateral lower limbs graded 2+/5, clearly unreliable and inconsistent with her ability to ambulate independently and stand on one foot. . . . The claimant performs an unreliable straightaway walk, tandem step, one-foot stance, toe walk, heel walk, and Romberg test. She moves from seated to standing unremarkably. She got on to and from the examining table unremarkably. She moved from the supine to the upright position unassisted.

Id. The ALJ gave greatest weight to this consultative report, as it was her province to do in

light of the conflicting medical evidence.  In view of this substantial evidence opposing the opinion of Dr. Jain, the ALJ was justified in rejecting his medical opinion that plaintiff was, in essence, so functionally limited as to be disabled.

2.  Plaintiff's Subjective Credibility

The inconsistencies identified in the foregoing section also weighed heavily in the ALJ's analysis of plaintiff's credibility as a witness.  As plaintiff asserts and the ALJ did not deny, there is clearly an underlying, objectively established medical condition here which could reasonably be expected to produce pain.  And the existence of such chronic pain was not doubted by her physicians, but was treated with various medical measures including oral and topical medications, intramuscular injections, and a transcutaneous electrical nerve stimulation unit.  However, as discussed by the ALJ, plaintiff's subjective credibility is "seriously erode[d]" by, *e.g.*, the inconsistency of her pain complaints to her physicians; the opinion of Dr. Rodriguez-Cruz; the fact that, between late 2009 and early 2011, plaintiff lost 45 pounds through Weight Watchers and exercise including walking on a treadmill for thirty minutes per day (Tr. 19, 923, 940-41) while she testified at her July 2011 hearing that the standing required to cook a full meal was overexertion enough to send her to bed (Tr. 43); and most significantly, the report of Dr. Keown.  (Tr. 21)  An ALJ's credibility determination is due considerable deference on judicial review, particularly since the ALJ, unlike the Court, has the opportunity to observe the plaintiff while testifying.  E.g., Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003).  The undersigned easily finds substantial evidence supporting that determination in this case.

3.  Plaintiff's Mental Impairment

Plaintiff argues that the ALJ erred in finding her mental impairments to be nonsevere, citing the record of her three visits with psychiatrist Dr. Durvasula in 2011. (Tr. 928-32) As referenced in Dr. Durvasula's notes, plaintiff was at that time taking psychotropic medications prescribed by Dr. Jain, including Doxepin, Cymbalta, and Klonopin. However, Doxepin was prescribed to treat plaintiff's insomnia, and Klonopin was prescribed to address the diagnosed "anxiety state, not otherwise specified (possible diagnosis)" which appears to follow from plaintiff's complaint of heart palpitations. (Tr. 590-92) Cymbalta is an anti-depressant which is often used to treat chronic pain, see http://www.drugs.com/cymbalta.html, and appears to have been prescribed at least in part for this purpose in plaintiff's case. (Tr. 749-50) While plaintiff makes much of the GAF score of 50 assigned by Dr. Durvasula, it is well established that a GAF score is largely superficial, representing "a clinician's subjective rating of an individual's overall psychological functioning" in terms "understandable by a lay person"; it is not raw medical data. Kennedy v. Astrue, 247 Fed.Appx. 761, 766 (6th Cir. Sept. 7, 2007) (citing Kornecky v. Comm'r of Soc. Sec., 167 Fed.Appx. 496, 511 (6th Cir. Feb. 9, 2006); see also, e.g., Smith v. Astrue, 565 F.Supp.2d 918, 925 (M.D. Tenn. 2008). Moreover, the ALJ properly considered this brief history of psychiatric care in the context of the stressors that prompted plaintiff to seek such care, which included helping to care for her 2-year-old grandchild (who was living with her at the time) as well as her mother who had been sick. (Tr. 16, 927) The ALJ's finding that these stressors likely represented temporary exacerbations of a stress level that had not previously prompted plaintiff to seek psychiatric care, and that the longitudinal record did not reveal significant limitations in any particular domain of psychiatric function, is supported by substantial evidence.

## IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 10th day of February, 2014.


 s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE